UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DOMINIC V. CAPOZZI,         *
                              *
      Petitioner,         *
                              *
   v.                   *     Civil Action No. 1:13-cv-10221-IT
                              *
DONALD LEVESQUE,         *
                              *
      Respondent.      *

MEMORANDUM AND ORDER

February 4, 2016

TALWANI, D.J.

Petitioner Dominic Capozzi ("Capozzi") has filed a Petition for Writ of Habeas Corpus [#1].  Capozzi contends that his conviction and incarceration for trafficking in cocaine violate federal law because (1) he was impermissibly prohibited from cross examining a witness for bias and from presenting his defense at trial and (2) the Commonwealth intimidated a defense witness into not testifying.  For the following reason, the petition is DENIED.

    I.      Procedural History

On June 13, 2008, Capozzi was indicted by a Plymouth County Grand Jury for trafficking cocaine in an amount of 100 grams or more.  See Suppl. Answer [#8] 46.  After a three-day trial in March 2010, a jury found Capozzi guilty of one count of cocaine trafficking.  Tr. 3:154-155.  Capozzi was sentenced to no less than ten years and no more than ten years and a day at Massachusetts Correctional Institute-Cedar Junction.  Suppl. Answer 7; Tr. 3:158.

Capozzi appealed his conviction to the Massachusetts Appeals Court ("Appeals Court").

Suppl. Answer 7, 11, 90.  The Appeals Court affirmed Capozzi's conviction on March 6, 2012.

Commonwealth v. Capozzi, No. 10-P-2138, 2012 WL 694387 (Mass. App. Ct., Mar. 6, 2012).

The Massachusetts Supreme Judicial Court declined further appellate review on May 3, 2012.

967 N.E.2d 634 (Table); Suppl. Answer 269.  On February 5, 2013, Capozzi filed the within

Petition for Writ of Habeas Corpus.

  II.  Standard of Review

  The court's review of the habeas petition is governed by the Antiterrorism and Effective

Death Penalty Act of 1996 ("AEDPA").  Under AEDPA, if a state court has adjudicated a claim

on the merits, the federal habeas court must defer to that adjudication unless it (1) "resulted in a

decision contrary to, or involved an unreasonable application of, clearly established Federal law,

as determined by the Supreme Court of the United States," or (2) "resulted in a decision that was

based on an unreasonable determination of the facts in light of the evidence presented in the

State court proceeding."  28 U.S.C. § 2254(d).  A federal court must review de novo any federal

claim presented to the state court but not adjudicated by the state court on the merits.  See

Clements v. Clarke, 592 F.3d 45, 52 (1st Cir. 2010).

  A claim is "adjudicated on the merits" if there is a "decision finally resolving the parties'

claims, with res judicata effect, that is based on the substance of the claim advanced, rather than

on a procedural, or other, ground." Teti v. Bender, 507 F.3d 50, 56-57 (1st Cir. 2007) (quoting

Sellan v. Kuhlman, 261 F.3d 303, 311 (2d Cir. 2001)).  A state court need not explain the

disposition or necessarily provide citations to federal law in order to adjudicate a federal

constitutional claim "on the merits."  See Zuluaga v. Spencer, 585 F.3d 27, 29-32 (1st Cir. 2009);

see also Clements, 592 F.3d at 53-54 (a state court's reference to state court decisions that

themselves deal with federal constitutional issues may be sufficient to trigger deferential review

2

under AEDPA).  Indeed, if a petitioner presents a federal claim to a state court and the state court denies relief, "it may be presumed that the state court adjudicated the claim on the merits in absence of any indication or state-law procedural principles to the contrary."  Harrington v. Richter, 562 U.S. 86, 99 (2011).

The First Circuit stated, prior to the Supreme Court's decision in Harrington, that "[i]f the state court has not decided the federal constitutional claim (even by reference to state court decisions dealing with federal constitutional issues)," then the federal claim constitutional claim was not "adjudicated on the merits" within the meaning of § 2254.  DiBenedetto v. Hall, 272 F.3d 1, 6 (1st Cir. 2001); see also Fortini v. Murphy, 257 F.3d 39, 47 (1st Cir. 2001) ("we can hardly defer to the state court on an issue that the state court did not address").  It is not clear that the rule set forth in these decisions, that *de novo* review is available for claims not expressly and individually addressed by the state court, survives the Supreme Court's decisions in Harrington. See Jewett v. Brady, 634 F.3d 67, 75 n.5 (1st Cir. 2011).  To the extent Harrington supersedes Fortini, the court would review Capozzi's claims with § 2254(d) deference, because Capozzi did present his federal claims to the Appeals Court and his appeal was denied in full.  However, to the extent Fortini and DiBenedetto are still good law, the court would review Capozzi's claims *de novo* because, though the Appeals Court disposed of his claims, they did so without any reference to federal law and without citation to any state law cases that themselves analyze the claims in federal law terms.  See Capozzi, 2012 WL 694387 at * 1.

Specifically, as to the first basis for Capozzi's habeas petition—that the limitations on one witness' cross examination and another's direct examination violated his federal constitutional rights—the three cases cited by the Appeals Court all address the discretion of a trial judge under state law to limit cross examination as to "extrinsic" issues or a witness' bias.

See Commonwealth v. Linton, 924 N.E.2d 722, 741 (Mass. 2010) (under state evidence rules,

"extrinsic evidence on a collateral matter may be introduced at trial for the purposes of

impeachment only in the discretion of the judge"); Commonwealth v. DiBenedetto, 693 N.E.2d

1007, 1012 (Mass. 1998) (limitation on cross examination to show bias is within the trial judge's

discretion); and Commonwealth v. LaVelle, 605 N.E.2d 852, 857 (Mass. 1993) (same).  Here,

one of the three cases cited by the Appeals Court in Capozzi's case is Commonwealth v.

DiBenedetto, 693 N.E.2d 1007 (Mass. 1998).  DiBenedetto, like Capozzi, argued on direct

appeal (in DiBenedetto's case to the Massachusetts Supreme Judicial Court ("SJC")) and to the

First Circuit on appeal of the denial of his subsequent habeas petition, that the trial court had

improperly prevented him from exposing a witness' bias on cross examination.  When the First

Circuit took up the habeas appeal, it concluded that the SJC had not reached the merits of

DiBenedetto's federal constitutional claims on this issue.  See DiBenedetto v. Hall, 272 F.3d at

5-7.   As a result, the First Circuit reviewed DiBenedetto's federal constitutional claims de novo.

Id. at 7.  Because the SJC's decision in DiBenedetto was one of the three cases relied on by the

Appeals Court in Capozzi's case, another was a case relied on in the SJC's DiBenedetto opinion

(Lavelle), and the third did not deal with the constitutional limits on a judge's discretion to limit

examination of a witness at all (Linton), if the First Circuit's DiBenedetto decision is still good

law, it compels this court to review Capozzi's claims regarding limitations on witness

examinations de novo.

The court need not settle whether the Appeals Court's rejection of Capozzi's claim

constituted review on the merits because, as set forth below, even under de novo review, this

claim fails.

As to the second basis for Capozzi's habeas petition—that the Commonwealth

improperly caused a defense witness to invoke the Fifth Amendment—the Appeals Court cited

two state court cases for the proposition that a witness may invoke the Fifth Amendment if his

testimony creates the possibility of a criminal prosecution.  See Capozzi, 2012 WL 694387 at * 2

(citing Commonwealth v. Dagenais, 776 N.E.2d 1010, 1016 (Mass. 2002); Commonwealth v.

Dias, 886 N.E.2d 713, 721 (Mass. 2008)).  These cases supported the Appeals Court's holding

that the witness that Capozzi wanted to have testify had properly asserted the privilege in this

case.  See id.  The Appeals Court did not, however, address whether Capozzi's federal

constitutional rights were violated by what he contends was conduct attributable to the

Commonwealth that resulted in the witness' invocation of the privilege and instead held that the

witness' testimony was properly excluded because it was correctly deemed irrelevant,

cumulative of Capozzi's girlfriend's testimony, and inadmissible character evidence.  Id.

To the extent the Appeals Court's declined to reach whether the Commonwealth's

alleged interference with the witness' decision to testify was constitutional error because the

Appeals Court deemed that issue waived, this court's review of that claim would be barred.  See

Coleman v. Thompson, 501 U.S. 750, 724 (1991) (habeas review of federal claims barred where

"a state prisoner has defaulted his federal claims in state court pursuant to an independent and

adequate state procedural rule . . . unless the prisoner can demonstrate cause for the default and

actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to

consider the claims will result in a fundamental miscarriage of justice").  To the extent the

Appeals Court failed to reach the issue for any other reason, and if the rule in Fortini is still good

law, the court would apply de novo review to Capozzi's federal constitutional claim regarding

the Commonwealth's alleged interference with Capozzi's witness' testimony.

Again, however, the court need not settle whether the Appeals Court's rejection of

Capozzi's claim constituted review on the merits because even under *de novo* review, this claim

fails.

III.     Background

The sworn search warrant affidavit of Massachusetts State Police Trooper Christopher

Boyle ("Trooper Boyle") states that, around January 2008, a confidential informant referred to as

"RCI1" informed Trooper Boyle that a white male named "Dominic" supplied cocaine in the

Plymouth area.  Suppl. Answer 47-58 (Boyle Aff.), ¶¶ 4, 6.  The search warrant affidavit further

states that RCI1 understood Dominic distributed the cocaine from his home in Plymouth and that

RCI1 was able to buy cocaine supplied by Dominic from an intermediary (the "unwitting

person" or "UW").  See Id. ¶ 6.  Trooper Boyle's affidavit further states that RCI1 subsequently

participated in four controlled buys from the UW, each of which the police observed.  Id. ¶¶ 7,

16, 17, 18.  Trooper Boyle's affidavit states that during each purchase, police observed the UW

leave his meeting with RCI1, go directly to a home at 23 Nameloc Road in Plymouth, and then

return to RCI1 to complete the drug sale with drugs in hand.  Id.  The affidavit states further that

during one of the four controlled purchases, police observed the UW talking to Capozzi through

a window at 23 Nameloc Road, and during another, police observed Capozzi briefly exit and

return to the home.  Id. ¶¶ 16, 17.  Trooper Boyle's search warrant affidavit states further that

Capozzi listed 23 Nameloc Road as his current address with the United States Post Office, that

the Plymouth Police Department records listed the same address as Capozzi's address after

having responded to an incident there in 2007, and that vehicles registered to Capozzi and his

girlfriend were in the driveway on several occasions.  Id. ¶¶ 7, 8, 10, 13, 16, 18.

Trooper Boyle obtained a search warranted for 23 Nameloc Road and on March 20, 2008,

Trooper Boyle and at least a dozen other officers executed the warrant.  Capozzi was indicted on

June 13, 2008 for trafficking in cocaine based on the fruits of the search.  On January 29, 2009 Capozzi filed a motion to suppress the fruits of the search for lack of probable cause and lack of reason for a forcible no-knock entry.  See Suppl. Answer 4, 59-60.  The motion was denied on May 26, 2009.  Id. at 5, 61-76.  On August 10, 2009, Capozzi moved to dismiss the indictment, based on Trooper Boyle's conversations with and phone calls to Capozzi outside the presence or knowledge of counsel after Capozzi was arrested and had retained counsel.  Id. at 5, 186. Though the judge found that these conversations violated Capozzi's Sixth Amendment right to counsel, he denied the motion to dismiss the indictment after determining that the conduct was not egregious and did not prejudice Capozzi's relationship with his attorney.  Id. at 6, 196-207.

As the parties were preparing for trial, in July 2009, Capozzi's attorney submitted a letter to the Commonwealth advising that he believed Jeffrey O'Brien ("O'Brien") to be the UW and Kristen Kemp a.k.a. Christine Heroux ("Kemp") to be RCI1 and that he intended to call both as witnesses.  See Suppl. Answer at 81-85.[1]  Capozzi's attorney also provided an affidavit signed by O'Brien stating, among other things, that O'Brien had been in Capozzi's house more than 100 times to do odd jobs, had not seen drugs in Capozzi's house, had never seen Capozzi using drugs in his house, had never bought drugs from Capozzi, had never brought drugs to Capozzi's house, and had never given drugs to Capozzi.  Id. at 82.

The Commonwealth filed a motion in limine to exclude O'Brien and Kemp's testimony on November 2, 2009.  Id. at 6, 77-86.  The Commonwealth argued that Capozzi had not made a sufficient showing that the testimony was relevant to an issue at trial because O'Brien and Kemp

---

[1] Capozzi's attorney also requested that the Commonwealth turn over evidence of cooperation agreements between those witnesses and the Commonwealth based on a prior order requiring the Commonwealth to turn over such agreements with any "trial witness," whether called by the Commonwealth or Capozzi, as long as the witness was called in "good faith."  Suppl. Answer at 78, 81.

were not present at the execution of the search warrant.  Id. at 78-79.  The Commonwealth

further argued that Capozzi had not named the witnesses in good faith and had only done so to

compel the Commonwealth to disclose the names of individuals referenced in Trooper Boyle's

search warrant affidavit.  Id. at 79.  Capozzi responded that O'Brien's proffered testimony, as

reflected in his affidavit, was relevant to whether Capozzi was engaged in drug trafficking or not,

even if O'Brien was not in fact the UW and was not present at the execution of the warrant.  Id.

at 87-89.

On the trial court addressed the motion in limine on the first day of trial, at which point

Capozzi was no longer planning to call Kemp as a witness.  Tr. 1:5-1:6.  Before ruling on the

motion as to O'Brien's testimony, and on the Commonwealth's suggestion, the trial court

appointed counsel to confer with O'Brien regarding his potential Fifth Amendment privilege.

Tr. 1:6-9.  Later that day, O'Brien's appointed counsel informed the court that he believed

O'Brien had a valid Fifth Amendment claim that O'Brien wanted to waive.  Tr. 1:129-131.  The

court then held a brief voir dire of O'Brien during which O'Brien confirmed his intent to waive

the privilege.  Tr. 1:131-133.

On the second day of trial, appointed counsel informed the court that O'Brien had

decided not to waive his Fifth Amendment rights.  Tr. 2:247-248.  The trial court then directed

appointed counsel to confer with O'Brien as to the reason for his changed position.  Tr. 2:248.

Counsel reported back to the court that O'Brien had not been threatened but had been made an

"offer" the night before from someone O'Brien believed to be an informant for the police.  Tr.

2:248-249.  Capozzi's counsel explained to the court that O'Brien had been contacted the night

before from someone he believed to be an informant for a state trooper involved in Capozzi's

case asking him to do a drug deal and that O'Brien believed this to be a set up.  Tr. 2:250.

8

The trial judge heard argument the following day and concluded that no overt threat was made to O'Brien and that O'Brien had properly invoked his Fifth Amendment right against self-incrimination.  Tr. 3:4.  After allowing a brief recess for Capozzi's counsel to confer with O'Brien (with the permission of O'Brien's appointed counsel), the trial court stated that a motion for mistrial under Commonwealth v. Turner, 640 N.E.2d 488 (Mass. App. Ct. 1994) would be appropriate in a situation where the prosecution had interfered with a defendant's ability to present evidence favorable to him.  Tr. 3:10-11.  However, the trial court concluded that Turner would be inapplicable to the case before it, because O'Brien's proffered testimony, as reflected in his affidavit, was "probably inadmissible" "specific act" character evidence.  Id.

At trial, DEA Special Agent Asa Morse testified for the Commonwealth that during the execution of the search warrant he searched a shelving unit in the basement after being told by a K-9 handler that the dog had alerted to drugs in the area.  Tr. 2:12.  Agent Morse testified further that he then pried the top shelf apart with a screwdriver and discovered a "hide" containing a five digital scales and a plastics bags with a white substance (later determined to be over 106 grams of cocaine).  Tr. 2:13-15; 2:20-23; 1:100-101.

Trooper Boyle testified that he found Capozzi in the master bedroom's bathroom during the execution of the warrant with his girlfriend Jennifer Senior ("Senior").  Tr. 2:84-85. Capozzi was handcuffed and removed from the bathroom to be searched by Trooper James Gilmore.  Tr. 1:134-140; 2:86-87.  Capozzi cross-examined Trooper Boyle about his deliberate destruction of the notes he made during the investigation leading up to the search warrant and during the execution of the search warrant (Tr. 2:105-107); inconsistencies between Trooper Boyle's trial and grand jury testimony regarding the execution of the search warrant (Tr. 2:138-143; 2:160-163); Trooper Boyle's failure to include in his reports of the execution of the search warrant

Capozzi's alleged statement that he would cooperate with the police by providing information regarding other drug dealers in the area (Tr. 2:152-157); and Trooper Boyle's destruction of his notes regarding the serial numbers on a one hundred dollar bill seized during the execution of the search warrant (Tr. 2:167-169).

Trooper Gilmore testified that he found $4,220 in cash, a plastic bag containing nine smaller plastic bag containing a white substance (later determined to be cocaine), keys, receipts, and a pill bottle with Capozzi's name on it, all in the pocket of the pants Capozzi was allegedly wearing. Tr. 1:140-44; 1:92-95.

Trooper James Arroyo testified that, during the execution of the warrant, he told Capozzi that drugs had been found in the house and asked Capozzi where they would be located if that were so. Tr. 1:216. According to Trooper Arroyo, Capozzi counted out loud "one two three" and then said the third shelf in the cellar. Tr. 1:216-17.[2]

Senior testified for Capozzi that she had never seen any drugs in the house or in the basement hide in particular (Tr. 3:79-80); that outsiders including O'Brien had regular and even daily access to the house (Tr. 3:33-34; 3:64-67); that Capozzi was wearing boxer shorts when he was arrested and was not wearing the pants in which the drugs when they were allegedly found (Tr. 3:46-47; 3:69-70); and that the cash on Capozzi's nightstand was from the sale of his four wheeler (Tr. 3:56).

The court sustained objections to the following questions posed to Trooper Boyle on cross examination: (1) whether Trooper Boyle signed the search warrant affidavit under the penalties and pains of perjury (Tr. 2:102); (2) whether Trooper Boyle mischaracterized in the search warrant affidavit what side of the front door the address number was displayed on the

---

[2] Additional witnesses not mentioned here also testified for the Commonwealth.

10

Nameloc Road residence (Tr 2:103); and (3) whether Trooper Boyle spoke with Capozzi after

the search warrant was executed outside of the presence of counsel (the basis for the denied

motion to dismiss) (Tr. 2:171).  The court also sustained the Commonwealth's objections to the

following questions to Trooper Boyle regarding his investigation leading up to the search

warrant: (1) whether Trooper Boyle saw a five-foot seven-inch white male walking in the area of

Capozzi's house when Trooper Boyle was conducting surveillance of the home (Tr. 2:108); (2)

whether Trooper Boyle interacted with anyone other than law enforcement while he was

conducting surveillance of Capozzi's home (Tr. 2:109); (3) whether "the subject" of Trooper

Boyle's investigation was someone other than Cappozi (Tr. 2:111); and (4) whether law

enforcement followed anyone other than Capozzi while Trooper Boyle was conducting

surveillance of Capozzi's home (id.).  Finally, the trial judge sustained the Commonwealth's

objection to Capozzi's question to Senior as to whether she had ever seen drugs on Capozzi's

person while in his house violated his right to present a defense.  Tr. 3:79.

Before resting, Capozzi moved for a mistrial based on the fact that Capozzi could not call

O'Brien to testify, which issue the court deemed waived.  Tr. 3:93-94.  Specifically, the trial

court noted that it had had no authority to conduct an investigation into the nature of the phone

call to O'Brien that prompted him to withdraw his waiver of his Fifth Amendment rights in the

posture that the issue had been presented to him—i.e., on the government's motion in limine.

Tr. 3:94.

IV.    Discussion

Capozzi asserts two bases for his habeas petition: first, that the trial court precluded him

from establishing Trooper Boyle's bias on cross examination and from eliciting testimony from

Trooper Boyle and Senior that supported his theory of defense, in violation of his Fourteenth

Amendment rights, and second, that the Commonwealth improperly interfered with his ability to present O'Brien's testimony in violation of his Fourteenth Amendment rights.

      1.  <u>Limitations on Cross-Examination of Boyle and Direct Examination of Senior</u>

      a.  <u>Right to Cross-Examine for Bias</u>

The Sixth Amendment Confrontation Clause prohibits a trial judge from "so restrict[ing] cross-examination as to deprive the defendant of the constitutionally required threshold level of inquiry, and must give the accused sufficient leeway to establish a reasonably complete picture of the witness's veracity, bias, and motivation." <u>Stephens v. Hall</u>, 294 F.3d 210, 226 (1st Cir. 2002).

The Sixth Amendment does not, however, prevent a trial judge from imposing some limits on the scope of a defendant's cross-examination of a witness. <u>Delaware v. Van Arsdall</u>, 475 U.S. 673, 679 (1986). The standard by which to assess the constitutionality of limits on a defendant's ability to cross-examine a witness for the purpose of exposing bias is set forth by the Supreme Court's decision in <u>Van Arsdall</u>. There, the Supreme Court held that the trial court's refusal to permit the defendant to cross-examine a witness regarding the state's dismissal of a public drunkenness charge pending against the witness in exchange for his testimony against the defendant violated the defendant's rights under the Sixth Amendment Confrontation Clause. <u>Id.</u> at 679-80. Specifically, the Court held that

> a criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby "to expose the jury to facts from which jurors could appropriately draw inferences relating to the reliability of the witness."

<u>Id.</u> at 680 (quoting <u>Davis v. Alaska</u>, 415 U.S. 308, 318 (1974)). Because the jury might have received a "significantly different impression" of the witness' credibility had the defendant been

permitted to pursue his proposed line of questioning, the Supreme Court concluded that a constitutional violation had occurred.  Id.  The Supreme Court also held, however, that "the constitutionally improper denial of a defendant's opportunity to impeach a witness for bias" is subject to harmless-error analysis.  Id. at 684.  Therefore, in determining whether a limitation on cross-examination aimed at establishing a witness' bias violates Van Arsdall, a habeas court must determine (1) whether the trial judge's limitation prejudiced the witness' examination such that, absent the limitation, the jury would have had a "significantly different impression" of the witness' credibility; and (2) whether the limitation was harmless error.  DiBenedetto, 272 F.3d at 10 (citing Van Arsdall, 475 U.S. at 679-80, 681).  Whereas the first inquiry focuses on the impact of the trial court's cross-examination restrictions on the jury's impression of the testimony of "the particular witness, not on the outcome of the entire trial," Van Arsdall, 475 U.S. at 680, the harmless-error inquiry focuses on the impact of the constitutional error on the verdict and "depends on a host of factors," id. at 684.

Here, Capozzi contends that it was constitutional error for the trial court to sustain objections to certain questions that sought to establish Trooper Boyle's bias: (1) whether Trooper Boyle signed the search warrant affidavit under the penalties and pains of perjury; (2) whether Trooper Boyle mischaracterized in the search warrant affidavit what side of the front door the address number was displayed on the Nameloc Road residence; and (3) whether Trooper Boyle spoke with Capozzi after the search warrant was executed outside of the presence of counsel.

The trial court's exclusion of the foregoing testimony did not violate Capozzi's constitutional rights.  First, Capozzi has not established how answers to any of the above questions could have established Trooper Boyle's bias or given the jury a "significantly different impression" of his credibility.  Van Arsdall, 475 U.S. at 680.  This is especially so because none

of these issues were relevant to any aspect of the execution of the search warrant which was ultimately the basis for Capozzi's prosecution. Thus, because the questions that Capozzi sought to ask were at best marginally relevant to establishing Trooper Boyle's bias, it was not a violation of his Sixth Amendment right to limit his ability to ask them. See United States v. Houghton, 554 F.2d 1219, 1225 (1st Cir. 1977) ("A defendant has a right to cross-examine as to bias except where such an inquiry would be irrelevant to establishing the credibility of the witness."); see also Bui v. DiPaolo, 170 F.3d 232, 244 (1st Cir. 1999) ("inherent speculativeness" of source or type of bias permits reasonable limitations on exploration of that bias);

Moreover, the Confrontation Clause does not allow the defendant to cross-examine a witness as to "every conceivable theory of bias." Bui, 170 F.3d at 242. Rather, the Confrontation Clause is satisfied "as long as the defendant is given a fair chance to inquire into a witness's bias" and a defendant is not deprived of that chance "if the trial court legitimately determines that his cross-examination is inappropriate." Id. (citing Van Arsdall, 475 U.S. at 679). Indeed, the Van Arsdall court noted that it was the trial court's prohibition on "*all* inquiry into the possibility that [the witness] would be biased as a result of the State's dismissal of his pending public drunkenness charge" in that case that raised constitutional concerns. Van Arsdall, 475 U.S. at 679 (emphasis added).

Here, by contrast, Capozzi had extensive opportunity to cross-examine Trooper Boyle, including by asking questions that could have exposed bias or lack of credibility. Specifically, Capozzi cross-examined Trooper Boyle about his deliberate destruction of the notes he made during the investigation leading up to the search warrant and during the execution of the search warrant; inconsistencies between his trial and grand jury testimony regarding the execution of

the search warrant; Trooper Boyle's failure to include in his reports of the execution of the
search warrant Capozzi's alleged statement that he would cooperate with the police by providing
information regarding other drug dealers in the area; and Trooper Boyle's destruction of his
notes regarding the serial numbers on a one hundred dollar bill seized during the execution of the
search warrant.  These inquiries were directly relevant to Trooper Boyle's credibility and were
ably exposed on cross-examination.  Thus, particularly because of the testimony that Capozzi did
expose on cross examination, Capozzi cannot establish that the jury would have had a
"significantly different impression" of his credibility had the trial judge permitted him to ask the
proposed questions.

In addition, the harmful error prong of Van Arsdall is not satisfied. The harmless-error
analysis on habeas review allows reversal only if a constitutional error "had a substantial and
injurious effect or influence on determining the jury's verdict."  Brecht v. Abramson, 507 U.S.
619, 637 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)).  As the court in
Van Arsdall noted, whether an error is harmless depends on several factors including "the
importance of the witness' testimony in the prosecution's case, whether the testimony was
cumulative, the presence or absence of evidence corroborating or contradicting the testimony of
the witness on material points, the extent of the cross-examination otherwise permitted, and, of
course, the overall strength of the prosecution's case."  Van Arsdall, 475 U.S. at 684.

Here, Trooper Boyle's testimony was undoubtedly important to the prosecution's case,
but several other officers who participated in the execution of the search warrant also testified
consistently with Trooper Boyle on the key facts.  Moreover, Trooper Boyle was not the officer
who discovered the cocaine in the hide, nor the officer who searched Capozzi, nor the officer to
whom Capozzi made inculpatory statement regarding the location of the cocaine that had already

been found.  Therefore, the significance of his testimony was largely foundational and to

describe the circumstances of the execution of the search warrant but not to introduce substantial

evidence of Capozzi's guilt for the offense charged.  And, as noted above, Capozzi was

otherwise given extensive opportunity to cross examine Trooper Boyle on many other topics,

some of them impeaching.  Accordingly, even if Capozzi could demonstrate that the limitation

on the Capozzi's questions to Trooper Boyle was improper, Capozzi has not demonstrated that

the limitations had a substantial and injurious impact on the verdict.

### b.  Right to Present a Defense

Capozzi further contends that limitations on his cross examination of Trooper Boyle

regarding the investigation leading up to the search warrant and a limitation on his direct

examination of Senior violated his right to present a defense.  "A defendant's right to offer the

testimony of witnesses, and compel their attendance, if necessary, is in plain terms, the right to

present a defense, and such a right is a fundamental element of due process of law."  United

States v. Ramos, 763 F.3d 45, 53 (1st Cir. 2014) (internal quotations and citations omitted).  "[A]

defendant's right to elicit exculpatory defense evidence through cross-examination falls within

the ambit of this longstanding right."  Brown, 630 F.3d at 72 (citing Chambers v. Mississippi,

410 U.S. 284, 302 (1973) (defendant's right to present defense violated when not permitted to

cross-examine alternative suspect nor call witnesses for purpose of impeaching that suspect's

testimony).

Again, however, the right to present a defense is not "unfettered" and it does not afford a

defendant the absolute right to introduce testimony that is "incompetent, privileged or otherwise

inadmissible by standard evidence rules."  Ramos, 763 F.3d at 53.  Rather, "[t]he Constitution

ultimately demands a *fair* opportunity to present a defense, and it is generally fair to force a

defendant to comply with established rules of procedure of evidence and to abide by the balancing of values such rules represent." Santiago v. O'Brien, 628 F.3d 30, 34 (1st Cir. 2010) (emphasis in original) (citing Chambers 410 U.S. at 302). The right to present a defense is therefore "abridged by evidence rules that 'infringe upon a weighty interest of the accused' and are 'arbitrary' or 'disproportionate to the purposes they are designed to serve.'" Brown, 630 F.3d at 72 (quoting Holmes v. South Carolina, 547 U.S. 319, 324 (2006)). Well-established evidence rules that permit trial judges to "exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury" serve such a legitimate purpose and it is not a constitutional violation to apply those rules to evidence offered by a defendant. Holmes, 547 U.S. at 326; see also id. at 326-327 ("the Constitution permits judges 'to exclude evidence that is repetitive . . . , only marginally relevant, or poses an undue risk of harassment, prejudice [or] confusion of the issues'") (quoting Crane v. Kentucky, 476 U.S. 683, 689-690 (1986)) (internal quotation omitted) (ellipsis and brackets in original).

In addition, even if the state court errs in applying its state evidence rules, the First Circuit has made clear that "not every *ad hoc* mistake in applying state evidence rules . . . should be called a violation of due process; otherwise every significant state court error in excluding evidence offered by the defendant would be a basis for undoing the conviction." Fortini, 257 F.3d at 47 (1st Cir. 2001). Indeed, only in "egregious" or "extreme" circumstances will the exclusion of evidence merit reversal of a state court decision. See id.; see also O'Brien v. Marshall, 453 F.3d 13, 20 (1st Cir. 2006) ("the Supreme Court has 'rarely' overturned state convictions because evidence was excluded and has 'in recent years . . . made clear that . . . only in extreme cases'" will such claims succeed) (quoting Fortini, 257 F.3d at 47) (ellipsis in

original); Ellsworth v. Warden, 333 F.3d 1, 7 (1st Cir. 2003) (en banc) (noting that a challenge

based on restrictions on cross examination "is tenable only where the restriction is manifestly

unreasonably or overbroad").  Thus, where a defendant has some opportunity to present his

theory of defense, his constitutional rights are not violated by some limitations on his ability to

elicit further evidence, even if that limitation is the result of a misapplication of the relevant

evidence rules.  See Brown, 630 F.3d at 62 (affirming denial of habeas petition where

defendant's cross examination of two officers were limited but defendant had "numerous other

avenues for advancing his misidentification defense"); United States v. Cunan, 152 F.3d 29, 38

(1st Cir. 1998) (right to present a defense not violated where trial court did not "foreclose" the

defendant's ability to present his theory of the defense by excluding hearsay evidence and "there

was sufficient evidence before the jury from which to present this defense").

Capozzi contends that the trial judge violated his right to present a defense by sustaining

objections to questions to Trooper Boyle regarding his investigation leading up to the search

warrant and to a question to Senior as to whether she had ever seen drugs on Capozzi's person in

his house.  Specifically, Capozzi contends that by not being allowed to ask the foregoing

questions, he was not able to establish his theory to the jury that he was not a drug dealer and

that the police fabricated the discovery of the cocaine on his person and his alleged statement

regarding the location of the drugs in the basement hide.  See Pet'r's Mem. Law Supp. Pet. Writ

Habeas Corpus 7 [#13].

As to the questions posed to Trooper Boyle, the Appeals Court held that the

Commonwealth's objections were properly sustained because any question about probable cause

was fully litigated at the motion to suppress stage and was not before the jury.  See Cappozi,

2012 WL 694387 at * 1.  Capozzi urges, however, that the proposed questions did not so much

seek to challenge the sufficiency of the probable cause to support the search warrant, as to support his theory of defense that he was not drug dealer and that evidence suggesting that he was one was fabricated.  With this in mind, and in view of the facts set forth in Trooper Boyle's search warrant affidavit, it appears that Capozzi sought to elicit from Trooper Boyle that he had observed the UW coming and going from Capozzi's house and that the UW was the person directly responsible for selling drugs to the confidential informant.  This testimony could have been probative of whether other people including drug dealers had access to the home and were responsible for drugs found in the basement.  In this way, the testimony would be relevant to an issue before the jury: whether Capozzi was responsible for the drugs in his basement.  In any event, it appears that the trial court and Appeals Court concluded that whatever the probative value of the testimony, it was outweighed by other concerns such as potential jury confusion.

As noted above, even if the state courts erred in balancing the probative value of Capozzi's proffered line of questioning against its prejudicial effect, the exclusion of this testimony that resulted was not necessarily a constitutional violation.  See Ellsworth, 333 F.3d at 8 ("close calls" in weighing the probative value of evidence against its potential prejudicial effects "are common and, right or wrong, do not thereby become constitutional violations").  Here, because Capozzi was able to introduce his defense theory through Senior's testimony, the limitations on Trooper Boyle's testimony do not present an "extreme circumstance" that rises to a constitutional violation and merits reversal of the conviction.  See Fortini, 257 F.3d at 46-48 (applying de novo review of federal claims and upholding denial of habeas relief review despite conclusion that it was error to exclude exculpatory evidence because error did not "add up to the kind of fundamental unfairness that warrants a federal court in finding a violation of due process").  Specifically, Senior testified on direct examination to nearly everything that Capozzi

sought to establish through Trooper Boyle, including that O'Brien had daily access to the house. Though Capozzi might have further established through Trooper Boyle that O'Brien was the UW, a fact which could have been relevant to showing that the drugs were the UW's (but could also have been relevant to showing that Capozzi was involved in drug trafficking), exclusion of this line of questioning did not preclude Capozzi's defense that the drugs were not his.

As to the limitation on Senior's testimony, the Appeals Court determined that the testimony Capozzi sought to elicit was collateral, irrelevant and improper character evidence. Capozzi, 2012 WL 694387 at * 2. Capozzi does not appear to dispute the Appeals Court's determination that the testimony was improper "specific act" evidence under Massachusetts evidence law, and it appears that such testimony would in fact be prohibited. See Mass. R. Evid 404(a)(1), (a)(2)(A). Nevertheless, even if the determination that Senior's answer was inadmissible as irrelevant or improper character evidence was a misapplication of state evidence rules, this limitation did not foreclose Capozzi's opportunity to establish his theory of the defense through Senior's other testimony and therefore did not cause a constitutional error. As noted above, Senior was permitted to testify that she had never seen drugs in the house and that Capozzi was not wearing the pants on which the individually packaged drugs when they were allegedly found. Moreover, Senior was able to testify that she had never seen drugs at all in the 23 Nameloc Road residence at all; further testimony that she had specifically not seen drugs on Capozzi's person *while in the house* would have merely duplicative.

Thus, notwithstanding the sustained objections, Capozzi was able to introduce evidence to support his defense that he was not a drug dealer and that the discovery of the drugs on his person had been fabricated. In light of the avenues through which Capozzi could have and did establish his theory of the defense, the limitations on Trooper Boyle's and Senior's testimony

were not the sort of limitations, even if error, that are constitutional violations.

For the foregoing reasons, the first basis for Capozzi's habeas petition is denied.

2.  Improper Interference with O'Brien's Decision to Testify

The second basis for Capozzi's habeas petition is that his constitutional rights to present a defense, to compulsory process, and to a fair trial were violated when the Commonwealth improperly influenced O'Brien not to testify.  In Webb v. Texas, 409 U.S. 95, 98 (1972) (per curiam), the Supreme Court held that the right to due process is violated by improper governmental interference with a witness' decision to testify.  Subsequently, in United States v. Valenzuela-Bernal, 458 U.S. 858, 873 (1982) the Supreme Court held that, to make out a constitutional violation based on the government's interference with a witness' testimony, a defendant must show not merely that the desired testimony was unavailable, but that if it had been offered it would have been both material and favorable to the defense.  In United States v. Hoffman, the First Circuit reviewed these case and held that "[t]here can be no violation of the defense's right to present evidence . . . unless some contested act or omission (1) can be attributed to the sovereign and (2) causes the loss or erosion of testimony which is both (3) material to the case and (4) favorable to the accused."  832 F.2d 1299, 1303 (1st Cir. 1987).  Several Circuit courts have further held that the level of governmental interference with a witness' decision to testify must be "substantial" to be a constitutional violation.  See United States v. Pablo, 696 F.3d 1280, 1295-96 (10th Cir. 2012);  Lambert v. Blackwell, 387 F.3d 210, 260 (3d Cir. 2004); United States v. Bieganowksi, 313 F.3d 264, 291 (5th Cir. 2002); Newell v. Hanks, 283 F.3d 827, 837 (7th Cir. 2002); United States v. Vavages, 151 F.3d 1185, 1189-90 (9th Cir. 1998); United States v. Foster, 128 F.3d 949, 953 (6th Cir. 1997)  The First Circuit has also found a constitutional claim lacking where the government did not "substantially interfere"

with a witness' decision to testify.  See United States v. Hall, 434 F.3d 42, 58 (1st Cir. 2006) (government did not "substantially interfere" with defendant's ability to call his wife as a witness by informing the court that his wife was the target of an investigation related to crimes for which the defendant had been convicted).

Capozzi's claim fails under the first of the four Hoffman requirements.  Namely, though Capozzi's counsel argued to the trial court that O'Brien had been contacted by an individual suspected of being an informant for a state trooper involved in Capozzi's case and that O'Brien suspected the call to be a set-up, there is no evidence as to who in fact placed the call to O'Brien.  And even if that fact had been established, there is no evidence that the Commonwealth directed the call to be made or that the individual was acting on behalf of the Commonwealth in making the call.  See United States v. Horton, 756 F.3d 569, 576 (8th Cir. 2014) (holding, in the context of an alleged due process violation caused by the misconduct of a government informant, that "because the Government neither directed or encouraged its informant's impermissible behavior, the informant's misconduct cannot be attributed to the Government").  Accordingly, to the extent O'Brien did not testify because of the phone call from the suspected informant, there is no evidence that the call was attributable to the Commonwealth and this is fatal to Capozzi's claim.

Capozzi's claim further fails under the second Hoffman prong because, even if the Commonwealth were responsible for the phone call to O'Brien, Capozzi has not established that it was the phone call that caused him to invoke his Fifth Amendment privilege.  Accepting Capozzi's version of events—that an informant contacted O'Brien and asked him to do a drug deal—there is no evidence that any threat of prosecution was communicated to him.  Indeed, the trial judge found that there was no threat.  Thus, it would be nothing more than speculation to conclude that the invitation to sell drugs, as opposed to O'Brien's cool reflection on the advice of

his appointed counsel from earlier that day, or anything else for that matter, had "caused" the loss of his testimony.  Moreover, even if the informant acting on behalf of the Commonwealth had warned O'Brien that he could be prosecuted for his role in the offenses for which Capozzi was being prosecuted, communicating those warnings would not have been a constitutional violation.  See Hall, 434 F.3d at 58 (no violation where government informed court and court informed witness that she was a target of investigation related to crimes for which defendant had been convicted).  Accordingly, in the absence of any evidence that what caused O'Brien to invoke his Fifth Amendment privilege was misconduct by the Commonwealth, O'Brien has not demonstrated that his constitutional rights were violated.[3]  As a result, the court need not consider whether the evidence O'Brien would have provided would have been material or favorable to Capozzi, and the second basis for Capozzi's habeas petition is denied.

V.    Conclusion

For the foregoing reasons, Capozzi's Petition for Writ of Habeas Corpus [#1] is DENIED.

IT IS SO ORDERED.

Date: February 4, 2016                                    /s/ Indira Talwani
                                                          United States District Judge

---

[3] The Commonwealth also argues that what "caused" the loss of O'Brien's testimony was not his invocation of the Fifth Amendment but the trial judge's ruling that the evidence was inadmissible "specific act" character evidence.  The court does not disagree that the testimony would have been inadmissible for the same reason that the limitation on Senior's testimony would have been appropriate under state evidence rules.  Moreover, because the trial court's exclusion of O'Brien's testimony did not foreclose Capozzi's ability to establish his theory of the defense, as discussed above, it was not a constitutional error.